CLERK'S OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED

JAN 27 2011

JULIA C. DUDLEY, CLERK
BY: _____
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO. 3:04CR00092-8 |
| | ) | |
| Plaintiff, | ) | |
| | ) | REPORT AND RECOMMENDATION |
| v. | ) | |
| | ) | |
| RASHADI ANDRE WEARING, | ) | |
| | ) | By: B. WAUGH CRIGLER |
| Defendant. | ) | U.S. MAGISTRATE JUDGE |

On December 2, 2009, the presiding District Judge referred the case to the undersigned to conduct an evidentiary hearing on the issue of Rashadi Andre Wearing's ("Wearing") competency at the time of his August 2005 guilty plea and to submit a report setting forth appropriate findings of fact, conclusions of law, and a recommended disposition. For the reasons that follow, the undersigned hereby RECOMMENDS that an Order enter finding that Wearing possessed the mental capacity to enter a knowing and voluntary plea in August 2005.

**PROCEDURAL BACKGROUND**

On December 8, 2004, a grand jury returned a five-count Indictment. Count One charged Wearing with being involved in a conspiracy to distribute and possess with intent to distribute 50 grams or more of cocaine base, also known as crack cocaine, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(A), all in violation of Title 21, United States Code, Section 846. Count Five charged Wearing with possession of a firearm by a convicted felon, in violation of Title 18, United States Code, Section 922(g).

A guilty plea hearing was held before the presiding District Judge on August 8, 2005. Pursuant to the terms of the plea agreement, Wearing tendered a plea of guilty to Count One of the Indictment. On June 27, 2006, Wearing was sentenced to two hundred and sixty-two (262) months' imprisonment, a sentence greater than he anticipated under the plea agreement.

Wearing filed a motion for reduction of sentence pursuant to 18 U.S.C. § 3582(c)(2) on May 8, 2008. The presiding District Judge granted the motion and reduced Wearing's sentence of imprisonment to two hundred and ten (210) months.

On May 18, 2007, Wearing filed a motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255. He alleged that his counsel was ineffective in the following respects: (1) misleading him into an unknowing, involuntary, and unintelligent plea; (2) failing to inform the court that he was under the influence of medication which impacted his ability to understand the proceedings; (3) failing to argue that his sentence was unreasonable under *United States v. Booker*, 543 U.S. 220 (2005) and 18 U.S.C. § 3553; (4) failing to argue the impropriety of his enhanced sentence; and (5) failing to appeal his conviction and sentence. The government filed a motion to dismiss on July 13, 2007. The matter was referred to the undersigned to conduct an evidentiary hearing specifically to determine whether Wearing requested that his attorney file an appeal.

The undersigned held an evidentiary hearing on May 9, 2008. The undersigned rendered a Report finding that Wearing had failed to prove by a preponderance of the evidence that he had requested an appeal and recommending that the government's motion to dismiss be granted. Wearing filed Objections to the Report. On August 12, 2008, the presiding District Judge adopted the Report, in part, and rejected it, in part. The presiding District Judge found that counsel had a *per* se duty to consult with Wearing about an appeal but failed to do so, and, as a result, Wearing's counsel had been ineffective. On that basis, the court granted defendant's § 2255 motion and re-entered judgment in the criminal action, thus allowing Wearing a renewed opportunity to file a direct appeal.

Wearing timely-filed an appeal asserting, *inter alia*, that he was not competent at the time to enter a guilty plea. The government moved for the Court of Appeals to remand the case to

2

give the District Court an opportunity to determine Wearing's competency to enter a guilty plea. Wearing did not object to the motion, and on November 12, 2009, the Fourth Circuit Court of Appeals vacated the judgment of conviction and remanded to the District Court for further proceedings to determine Wearing's competency at the time of his guilty plea. On December 2, 2009, the presiding District Judge referred the case to the undersigned to conduct an evidentiary hearing on the issue of defendant's competency at the time of his guilty plea and to submit a report setting forth appropriate findings of fact, conclusions of law, and a recommended disposition.

**EVIDENCE PRESENTED**

### INTRODUCTION

The evidence adduced at the plenary hearing on October 26, 2010 was limited by the parties to that of their respective experts. Wearing offered evidence by J. Anderson Thomson, Jr., M.D., a forensic psychiatrist, and Marilyn F. Minrath, Ph.D., M.S.N., a forensic psychologist, both of whom were appointed by the court to examine defendant and report the results thereof. These two experts conducted an evaluation of the defendant and rendered a jointly prepared report of their evaluation. The government secured Wearing's transfer to FCI Lexington, Kentucky for an evaluation which was conducted by Dia N. Brannen, Ph.D., a forensic psychologist employed by the Bureau of Prisons. Dr. Brannen, likewise, rendered a written report of her evaluation.

The parties elected both to examine the experts at the hearing and to offer their written reports into evidence for the truth of the matters asserted therein. In addition to the information the experts gathered from their respective examinations of the defendant, they examined the medical records generated while the defendant was detained pending trial at Central Virginia Regional Jail (CVRJ), interviewed the CVRJ in-house mental health care provider and reviewed

3

and relied on various court records, including transcripts from the plea proceedings in this case as well as from the May 2008 plenary hearing on Wearing's motion to vacate under 28 U.S.C. § 2255, *Rashadi Andre Wearing v. United States of America*, Civil Action No. 7:07-cv-00253. To the extent relevant to these proceedings, the undersigned will take judicial notice of all of the records in the two cases.

## MEDICAL EVIDENCE

### Dr. Thomson

James Anderson Thomson, Jr., a forensic psychiatrist, testified that he, along with Marilyn Minrath, Ph.D., M.S.N., a clinical psychologist, conducted a joint evaluation of the defendant at CVRJ on February 20, 2010. The joint evaluation lasted between two and four hours. After that, Dr. Thomson reviewed Wearing's medical chart at the facility and interviewed nurses on duty at the time. In the meantime, Minrath conducted certain psychological tests. Thomson also later contacted Michael Dowen, Psy.D., the mental health professional at CVRJ who treated defendant while he was detained there.[1]

Dr. Thomson revealed that the focus of their evaluation was to determine whether Wearing was competent to enter his guilty plea in August 2005, "under the *Damon* case."[2] Dr. Thomson stated that defendant appeared cooperative and candid during the interview, and that much of the information gathered about his mental status consisted of what defendant self-

---

[1] The substance of Dr. Thomson's telephone contact with Dr. Dowen is reflected in the joint Forensic Evaluation submitted by Drs. Thomson and Minrath. Def.'s Exhibit 2, p. 8. Dr. Thomson's testimony revealed that his conversation was a bit more in depth than that which was reported in the Forensic Evaluation.

[2] A colloquy between the undersigned, Wearing's counsel and the counsel for the government later occurred on the record in which Wearing took the position that *United States v. Damon*, 191 F.3d 561 (4th Cir. 1999) mandated vacating the plea if there was any "possibility" his mental state or the effects of his medicinal regimen affected his competency to plead guilty. The undersigned concludes from all the evidence adduced by defendant that it was this interpretation of *Damon* that framed the "focus" of the evaluation conducted and the opinions reached by Drs. Thomson and Minrath concerning Wearing's competency to plead guilty.

reported. Dr. Thomson noted that defendant's treatment records were important to his evaluation, especially the fact that Dr. Dowen thought defendant was undergoing a bipolar process for which he prescribed medications, albeit in less than therapeutic doses. While he did not provide a diagnosis in the Forensic Evaluation, Dr. Thomson opined on the stand that in August 2005, Wearing's records were "consistent with" a diagnosis of a bipolar affective disorder, namely a Bipolar Type I disorder under DSM-IV.[3]

Thomson emphasized that a bipolar disorder is a mood disorder and not a cognitive disorder. While he offered that this bipolar disorder generally could have a secondary impact on perception, thinking (but not a disruption in thinking), decision-making and relationships with others, particularly defendant's counsel. However, Dr. Thomson opined that the condition does not produce confusion or cognitive disruption, only disruptions in mood, such as euphoria, depression, pressured thinking, and racing thoughts. When specifically asked whether he had an opinion about the condition's impact on Wearing's ability to understand legal proceedings, Dr. Thomson could only say that there was a "possibility" that Wearing's disorder would decrease his ability to understand the legal process. Thomson also believed that defendant's mood disorder impacted his relationship with and, thus, his ability to work with his attorney in 2005. Thomson opined that Wearing's disorder led him to not "like what he was facing," that he became increasingly upset to the point of wanting changes in counsel, and that he constantly focused on blaming his attorney "without seeing he, himself, has a problem working with counsel."

Thomson had some difficulty answering the undersigned's question relating to how could Wearing be considered competent to "do anything---go to trial, not go to trial" or even work with counsel at any point in the proceedings, if he suffered the effects of a bipolar disorder Dr.

[3] The DSM criteria never were introduced into evidence nor did Dr. Thomson ever articulate which of the criteria defendant's condition was found to meet.

5

Thomson described. Dr. Thomson admitted he did not go "through all those questions," and limited his response simply to his belief that persons, in Wearing's condition, would not be able to work with their attorneys, and thus be incompetent in that regard. Dr. Thomson could only speculate as to the possibilities of defendant's competency had an examination occurred in 2005.

Upon further examination by Wearing's counsel, Dr. Thomson admitted that, based on all the information he had considered, he could not say "categorically" that suffering a bipolar disorder renders a person incompetent to plead guilty. When asked to articulate the factors he relied on in rendering his opinion at the hearing, in addition to the mere presence of bipolar disorder, he essentially returned to what he and Dr. Minrath believed were those supporting his "diagnosis" of bipolar disorder.

Dr. Thomson believed that a bipolar disorder manifests itself in different ways, depending on the type. He acknowledged that it is a difficult diagnosis to make and takes a length of time, often as much as eleven years, in order to determine from the symptoms that a person suffers any type of bipolar disorder. Wearing's counsel asked Dr. Thomson to consider the definition of "competency to stand trial" as the ability to understand the nature of the proceedings and to assist counsel in one's own defense. Dr. Thomson thought that Wearing's condition had the most impact on assisting counsel.

Dr. Thomson further acknowledged that there is a "very fine line" between one who has knowledge about the symptoms of a bipolar disorder and uses them to manipulate a diagnosis and another who suffers the symptoms whether they wish to or not. However, Dr. Thomson did not think defendant was malingering.

Much of the Forensic Evaluation focused on Wearing's own self-reporting and on Dr. Dowen's information, whose diagnosis Dr. Thomson credited. Dr. Thomson could not identify which of the necessary criteria for a bipolar disorder that are set forth in the DSM Wearing

actually met at the relevant time. Dr. Thomson opined that Wearing could be suffering Bipolar Type II and not Type I. Dr. Thomson further recognized that he did not observe, and Dr. Dowen did not report observed confusion or disorientation or any periods of mania or depression. Dr. Thomson testified that defendant claimed being both "always up" and "always down," which he believed were mixed states, characteristic of Bipolar Type I and II. Dr. Thomson further acknowledged defendant did not suffer hallucinations, was always articulate, appeared intelligent and was charming. Thomson testified that the joint Forensic Evaluation did not report any diagnosis, only that Wearing's condition was "in keeping" with persons with affective disorders, and that he never made a diagnosis himself. The only deficiencies Dr. Thomson found in defendant in 2005 were in the area of working with his counsel.

Dr. Thomson acknowledged that many defendants have that problem with and do not trust their attorneys, especially those paid by the government. He offered that the more patient the attorney is with his/her client, the more likely that the defendant would be able to work with the attorney. Dr. Thomson also admitted that none of the transcripts of the court proceedings revealed any claim by defendant that the proceedings were a "blur." He could not challenge the fact that Wearing had testified in prior court proceedings that he (Wearing) provided answers at his plea hearing not because he was confused but because he claimed he was told how to answer by his attorney.

Dr. Thomson did not accept cognitive confusion as an element of a bipolar condition. He opined that patients can be seriously affected by the mood disorder and yet be bright and articulate with no signs of cognitive confusion. Restated, Dr. Thomson was of the view that the absence of evidence of incompetence at the relevant time is not necessarily evidence of its absence, though he clearly opined that the mere presence of a bipolar disorder does not render a person incompetent. Dr. Thomson also testified that he did consider the "possibility" that

7

Wearing was exaggerating and admitted that some bipolar symptoms could result from a personality disorder which would not render the person incompetent.

Dr. Thomson further conceded that Wearing's records do not reveal any "observed" extreme moods, and that Wearing never was prescribed "therapeutic levels" of medications in 2005. According to Thomson, the medication levels Wearing was prescribed at that time would have had no effect on his ability to understand the proceedings.

Thompson further noted that the medication records from CVRJ do not reveal that Wearing was taking any type of medication on or around the dates of his plea hearing. There were entries reflecting the dates he took his prescribed medication, entries on the dates he refused his medication and, then, dates indicating no medications either were given or refused. Dr. Thomson took those absences to represent an "unclear" record of medications from which he concluded that medications were given and taken.[4]

**Dr. Minrath**

Marilyn Minrath, Ph.D., M.S.N., a forensic psychologist, conducted the clinical interview of Wearing along with Dr. Thomson and further administered the MMPI-2 psychological test. She testified that about 40% of her practice involves forensic evaluations, most of which are done with Dr. Thomson, and 60% of the time she sees patients and provides psychotherapeutic care. Some of her patients suffer bipolar affective disorders.

Minrath used anecdotal examples to illustrate that patients suffering bipolar disorders may appear functionally normal but make poor choices and decisions because of an inflated, narcissistic, egotistical self-image or might engage in unwise behavior or activity to impress

---

[4] Frankly, the undersigned believes Dr. Thomson's testimony in this regard to be the result of an uninformed conclusion on his part which fails to account for the universal need for protocols in correctional and detention facilities documenting the dispensing of medication to inmates in order to avoid the litigation risks associated with a failure to perform such documentation.

others for the perceived accrued benefits.[5] The common element to these extremes is egocentricity with an underlying bipolar condition that imparts either a very inflated or deflated sense of self. Relationships are rendered very difficult because the person can shift suddenly, like a veil descending over one's personality.

According to Minrath, the MMPI-2 is considered the "granddaddy" of psychological tests because it is objective. To her, this test is the most important element of a psychological evaluation. In Wearing's case, she interpreted the validity scales as a "cry for help," exhibiting emotional distress. By the same token, his "lie scale" and the "K" scale were not elevated, even low. This was interpreted as exhibiting a great deal of psychological stress, but not malingering or "faking bad." Minrath interpreted the tests as revealing cognitive confusion, pressured thinking, racing thoughts, agitation and paranoia. She acknowledged that it is not unusual for incarceration to produce some of these symptoms.

Minrath was of the view that the MMPI and most psychological tests should not be repeated within a year, though she recognized there could be exceptions. This is so because repeated testing might not produce a "clean," "smooth" or "uncontaminated" result, presumably because taking such a standardized test familiarizes one with and prepares one for a later test. This, in her view, could influence how the subject responds to the later test questions, leading her to believe "as a rule" the first test produces more accurate results. She explained that this concern could be assuaged by administering other objective tests along with a subsequent MMPI.

On cross examination, Minrath stated that 80% of her forensic criminal evaluations are performed on behalf of defendants, and that she serves on the Public Defender Advisory Committee. She recalled going to see Wearing on two occasions, February 20 and March 20, 2010, not just on the one occasion referenced by Dr. Thomson. Minrath did not report this

---

[5] Counsel referred to these extremes as "grandiosity" and "irritability."

discrepancy in the joint Forensic Evaluation submitted to the court. She also conceded that much of the evaluation was dependent on Wearing's self-reported behavior. Moreover, Minrath stated that the transcript of the plea proceedings was inconsistent with what defendant had related to her about the proceedings being a blur or being confused. She further agreed that the transcript of the habeas proceedings revealed his testifying that his answers to questions posed in the plea colloquy were the result of his attorney's direction and not a product of confusion.[6]

When examined about her diagnosis of the defendant, Minrath offered that Bipolar Type I requires "full blown mania," and that such was "not clear to me." Further, she acknowledged that the criteria for a diagnosis of Bipolar Type II require the presence of periods of both hypomania and depression. She believed there were "periods in his life" when defendant had been hypomanic and depressed. Thus, her conclusion was that Wearing suffers Bipolar Type II affective disorder, not the Bipolar Type I as offered either by Dr. Dowen in the medical reports or by Dr. Thomson in his testimony.[7] Minrath conceded that Dr. Dowen never described symptoms that would allow a diagnosis of bipolar because he never observed periods of mania.[8] In addition, Minrath testified that the transcript of the plea proceedings did not reveal any evidence of mania or depression, though Wearing's correspondence record indicates hypomanic activity by defendant in communicating with his attorney and the court.

Minrath was most concerned about Wearing's hypomania because its effects would make Wearing appear to know or comprehend more than he actually did. However, she admitted that Wearing's correspondence with his attorney came after the plea and before any attempt was

---

[6] The undersigned noted at the time that Minrath's answer was provided it was muffled and in a low tone of voice.

[7] Minrath was present in the courtroom during Thomson's testimony.

[8] Nor did Minrath ever observe any periods of mania while meeting with defendant.

made to appeal.[9] Minrath agreed that receiving an unexpected sentence some period of time after the plea was entered could have provoked a hypomanic episode which would not have been present at the time the plea was entered.

Minrath did not know what to make of Wearing's testimony that he did not become upset with his attorney until after he failed to receive the sentence he expected. Minrath simply "did not know what his mental state was at the time." She agreed that receiving an unexpected sentence would give a person the motivation to inflate the symptoms of incompetence. Moreover, she admitted that there was nothing in the transcript of the plea proceedings that would indicate Wearing did not have the ability to understand the proceedings or assist in his defense. Minrath believed it important to understand the derivative of bipolar impulsivity is that, if the ego is so inflated and mood so elevated that the person thinks what they are doing is "okay," the behavior becomes very unregulated and impulsive. She based this view on the premise that mood affects thinking, and here, thoughts would go too fast because they are pressured. As a result, and notwithstanding an absence of any record evidence of impulsivity on the day of Wearing's plea, Minrath was of the view that a person suffering the disorder could not "take in" what would be necessary to "make a good decision."

Minrath was further examined about the significance of the MMPI results. When all was said and done, she made clear her belief that the MMPI is the very best measure of a patient's mental state, together with evidence of his/her personality traits and styles **at the time** the test is administered. Her test was conducted a number of years after the entry of defendant's plea. Minrath agreed that it is very difficult to extrapolate backward to give a retrospective view of a

---

[9] Minrath believed that while some of the correspondence before Wearing's plea did exhibit a degree of legal sophistication, they also represented a grandiosity, i.e. "I am better than you or know more than you," which she opined is "what gets these people in trouble." Minrath explained, however, that she did not intend her testimony to mean that just because the condition "gets them in trouble" those suffering the condition are incompetent.

person's mental state on a particular day in the past. At best, the MMPI can give only some information, but cannot be the sole basis for any determination of competency in the past. In the end, Minrath acknowledged that she did not perform any further testing for cross-validation purposes, though she recognized that the more tests and time a person has with the patient, the more useful the information.[10]

**Dr. Brannen**

Dia N. Brannen, Ph.D., a forensic psychologist, testified that she has been employed with the Federal Bureau of Prisons for four years and presently serves as a forensic psychologist assigned to the Federal Medical Center, Lexington, Kentucky ("FMC Lexington"). Her experience before coming to FMC Lexington was as an intern and then a staff psychologist in the federal penal system. Since then, her primary focus has been to perform pretrial assessments of defendants for their competency to stand trial as well as their sanity at the time of an alleged offense.[11]

Dr. Brannen testified that, in addition to having the opportunity to observe defendant "casually" while at the institution, she spent between five and six hours with him in a face-to-face clinical interview. She further performed four psychological tests. Both Brannen's report and her testimony indicates that she also reviewed seventeen historical documents and interviewed defendant's counsel, counsel for the government, as well as Dr. Dowen, defendant's mental health care provider while at CRVJ.

Brannen believed that the psychological tests she administered revealed a person of average intelligence with strengths in the abilities to articulate, organize and reason abstractly.

---

[10] The undersigned receives this testimony not to discredit Dr. Minrath to any extent. However, it does reflect the utility of more extensive cross testing or the benefit of having an opportunity to observe the patient over a longer period of time than just the few hours utilized by Minrath and Thomson.

[11] Dr. Brannen's entire curriculum vitae was introduced into evidence. Pl's Exhibit No. 2.

Defendant did test below average in his ability to concentrate and focus and in his work memory. Wearing's personality inventory revealed a profile similar to that found by Minrath, though the cause for such was unclear. Brannen's test results differed from the results of clinical interviews and observed function in that there were elevated scores on schizophrenia, loss of contact with reality, delusions, hallucinations, bizarre ideas and beliefs about the presence of unique abilities and powers. She offered that such results ordinarily show the presence of a psychosis or thought disorder. However, all staff accounts of defendant were inconsistent with the presence of any psychosis. Wearing responded well to other inmates and staff while at the facility, and he had no problem adjusting to the routine at the institution.

Brannen testified that Wearing demonstrated symptoms of depression. She believed he suffered depressive disorder, which she pointed out was not the same as a bipolar disorder of any type. Brannen based her conclusion on the absence of mood fluctuations. She believed Wearing's condition was more severe than simply an adjustment disorder but less severe than a major depressive disorder because no one ever observed symptoms of such disorder, and the ones he reported were of short duration and remitted. Based on defendant's own self-reporting and the rest of the record she reviewed, Brannen also believed defendant suffered a personality disorder with antisocial and narcissistic features.

Brannen's view that Wearing did not suffer a bipolar disorder was based on the fact that neither his self-reported manic nor hypomanic episodes lasted for the periods required by the diagnostic criteria. Moreover, the reported episodes of depression never lasted for two weeks as is required for a bipolar condition. Brannen reiterated that a bipolar condition is a mood disorder, not a psychotic illness which can impact decision-making and affect one's competency.

Brannen opined that there were no indications of a bipolar condition, either at the time she evaluated defendant or at the time of his plea. Brannen testified that Dr. Dowen, whose

diagnosis of a bipolar condition is in the CVRJ records, revealed that he never observed any mania or other symptoms, except pressured speech. Dr. Dowen's determination was made principally on defendant's self-reported statements. From the records, including Dr. Dowen's notes, from the letters Wearing wrote to his counsel and the trial court, from the transcripts of court proceedings and from the "absence" in the record of any reports of bizarre behavior, spontaneous outbursts or anything showing the inability to follow conversations, Brannen was of the view that defendant did not suffer a bipolar disorder. Brannen believed that if there had been any bipolar episodes or episodes of depression, they would have been observed by someone over the period Wearing was incarcerated.

Brannen further testified that the affidavit from defendant's former trial counsel revealed good, though admittedly unpleasant, interaction between the two. Her view to a reasonable degree of psychological certainty was that, at all times, Wearing was competent to enter his plea. Moreover, Brannen pointed out that Wearing, essentially, was unmedicated at the time of his plea. She believed that her conclusion was consistent with what both Thomson and Minrath found, namely that defendant was prescribed sub-therapeutic low doses, and that he was non-compliant with his prescriptions at the time of the plea. Thus, Wearing could not have been rendered incompetent, under *Damon*, because he effectively was not medicated at the time of his plea. Finally, Brannen opined that Wearing's past competence is born out by his present competence because his behavior then and now has remained consistent.

Brannen again accounted for Dr. Dowen's records by explaining that his diagnosis was based primarily on defendant's self-reported symptoms. She also accounted for the Thomson-Minrath opinions concerning malingering on the basis that the SIMS test did not rule in or rule out malingering. At bottom on this issue, Brannen was of the belief that Wearing over-pathologizes his experience and, thus, exaggerates his circumstances. She credited the May 2006

evaluation of the defendant by David Israel, Ph.D., which retrospectively found Wearing competent even though he suffered a bipolar disorder. She believed that, of all the evaluations performed, Israel's diagnosis and conclusions came at a time closest to the plea proceedings.[12]

On cross examination, Brannen testified that she disagreed with Dowen's diagnosis because most of the evidence upon which it was made was self-reported, unobserved symptoms and, because Dowen never articulated which of the diagnostic criteria Wearing's condition satisfied. Instead, she believed Dowen focused on the stress Wearing claimed to be suffering at the time and not on whether he was telling the truth about his symptoms. Moreover, Brannen testified that Wearing's interactions with counsel and the court, particularly the letter to the prosecutor and the court which essentially derailed any hope for a downward departure, did not reflect an inability to assist counsel. She offered that a defendant may be completely competent yet "stupid" to the point he acts in a way which harms his case. In other words, Wearing's conduct may have been bad for him, even stupid, but, to Brannen, it was not the product of incompetence.

The remainder of Brannen's testimony consisted of answering questions posed by counsel for both sides seeking to ascertain whether it was "possible" certain conditions could or could not affect Wearing's competency. As reflected on the record of the hearing, the undersigned reminded counsel that the standard here is the preponderance of evidence standard, i.e. whether the position advanced is more likely true than not. At no time did Brannen opine that Wearing's underlying condition likely or probably rendered him incompetent. In fact, her testimony was that it did not.

---

[12] Dr. Israel performed a psychological evaluation on defendant in May 2006. His report was submitted to the presiding District Judge at defendant's sentencing.

**Thomson Rebuttal**

On rebuttal, Dr. Thomson pointed out there is a difference between a bipolar mood disorder and a narcissistic personality disorder. According to him, the former is a mental condition that is not stable over time, whereas the latter a character or maladaptive behavior disorder that is stable across time. Dr. Thomson believed Wearing's condition could fit both descriptions.

Thomson also explained that his diagnosis that Wearing suffers a Bipolar Type II disorder had been consistent over their period of his involvement. Yet, Thomson acknowledged that any two psychologists or psychiatrists evaluating Wearing retrospectively equally could come to opposite conclusions about whether Wearing suffered a bipolar disorder and whether it rendered him incompetent. In the end, Dr. Thomson reaffirmed the difficulty in making such a determination retrospectively.

## APPLICABLE LAW, FINDINGS AND CONCLUSIONS

As mentioned above, this case was remanded by the Fourth Circuit Court of Appeals at the request of the government to determine the defendant's competency at the time he entered his guilty plea. *United States v. Wearing*, Nos. 08-4827 and 08-7154 (4th Cir. November 12, 2009). While a proceeding under Fed. R. Crim. P. 11 is designed to provide the avenue by which the court ascertains whether a defendant knowingly and intelligently enters a plea, it is clear that "[b]efore a court may accept a guilty plea, it must ensure that the defendant is competent to enter the plea." *United States v. Damon*, 191 F.3d 561, 564 (4th Cir. 1999). The test for determining competency to enter a plea is the same as that to stand trial, namely whether a defendant "has sufficient present ability to *consult* with his lawyer with a reasonable degree of rational understanding - and whether he has a rational as well as factual understanding of the proceedings

against him." *Dusky v. United States*, 362 U.S. 402, 402 (1960) (emphasis added); *see also*

*Godinez v. Moran*, 509 U.S. 389, 402 (1993) (applying the standard to guilty plea proceedings).

In his pre-hearing Memorandum of Law, the defendant offers that the decision by the

Fourth Circuit Court of Appeals in *Damon* is to serve as the focus of the court's inquiry. That

case stands for the proposition that when a defendant is medicated, the court should determine

the effect, if any, of the medication on the defendant's ability to enter a knowing and voluntary

plea. *Damon*, 191 F.3d at 565.

In *Damon*, the trial court did not inquire about the effects of medication on the

defendant's competency to enter his plea of guilty. The Court of Appeals found that the trial

court had erred when it failed to inquire into the defendant's mental state and "the possibility"

that his judgment was impaired. *Id.* The court then remanded the case for evidentiary

proceedings to determine whether the medication taken by the defendant at the time, "based on

objective data about its nature and effect, had the capability to produce a sufficient effect on his

mental faculties to render him incompetent to enter a guilty plea." *Id.* In doing so, the court

cited *United States v. Truglio*, 493 F.2d 574, 578 (4th Cir. 1974), which stands for the principle

that the ultimate burden is on the defendant to show that his "mental faculties were so impaired

by drugs when he pleaded that he was incapable of full understanding and appreciation of the

charges against him, of comprehending his constitutional rights and of realizing the

consequences of his plea."

The difficulty the undersigned has with applying the results of *Damon* here is that the

preponderance of the evidence in this case fails to demonstrate that Wearing was even taking

medications immediately before, or on the date of or after he pleaded guilty. All the evidence

points to the fact that, at most, Wearing was prescribed less than therapeutic levels of medication

which, alone could support a finding he, essentially, was unmedicated at the time of his plea

hearing. The preponderance of the evidence shows the doses Wearing had been prescribed by Dr. Dowen were less than therapeutic levels, which, according to Wearing's own expert, Dr. Thomson, would not have rendered him incompetent.

The greatest weight of the evidence shows that Wearing was not even taking the prescribed levels before and on the date of the plea hearing. In arriving at this finding, the undersigned will draw the usual inference from the absence of entries in the official CVRJ medical record to find those absences demonstrate exactly what they purport to represent, namely that Wearing was not taking medications on the days where none were shown to have been dispensed or received. In this regard, the undersigned declines to accept Dr. Thomson's interpretation of the records that the absence of dispensing entries show they were dispensed. There is a great deal of credible evidence in the records before the court, even from Wearing's own prior testimony at the plea hearing and the post-conviction proceeding, demonstrating his refusal to take prescribed drugs during the relevant time. From all the evidence, the undersigned concludes that Wearing was not taking medication on the dates the CVRJ medication records reflect that none were dispensed or received, including the dates relevant to the entry of his plea. Accordingly, *Damon*, to the extent the decision rests on the potential effects of medication on a person's competency to plead guilty, is inapposite.

The larger question presented here is whether Wearing suffered any mental condition which rendered him incompetent to plead guilty on August 8, 2005. While there is significant precedent, even in this Circuit, on this subject, the undersigned believes that the "granddaddy" of all competency cases is *United States v. Moussaoui*, 591 F.3d 263 (4th Cir. 2010). To this court's knowledge, there has not been a case in this Circuit's recent history where the competency of a defendant at every level of the criminal process, including his competency to enter a guilty plea, has been more closely examined by both the trial and appellate courts. It does not articulate or

develop any new legal standard. Rather, the *Moussaoui* court merely applied the same authority the undersigned believes should guide this court, including *Dusky*, *Godinez*, and *Damon*. *Moussaoui* is important to the undersigned mostly for its analysis of all the rather complex factual circumstances providing a basis for the Fourth Circuit's decision on the question of his competency. The following are some of those circumstances.

First, Moussaoui repeatedly had rejected the help of at least three court appointed attorneys, had refused to follow the advice of a fourth and had refused to interact with numerous stand-by counsel the court had appointed to assist him. Moussaoui's interactions with the court and the lawyers who had attempted to represent him certainly were out of the ordinary, if not bizarre. There had been several attempts to hold Rule 11 proceedings, and at the final one, he appeared *pro se* facing some of the most serious charges in the history of the United States. If ever there has been a case where a defendant could be perceived as "shooting himself in the foot" by his own rather bizarre conduct, this one is it.

Second, the Court of Appeals acknowledged that, given the history of the case, there were numerous sources of evidence available to the trial court from which it could make the determination of competency. Those sources included the countervailing reports of numerous experts who had evaluated the defendant during the four-year pendency of the case, either upon order of the court or at the request of defense counsel.

The appellate court also seems to have taken pains to assess the value of the trial court's personal experience with the defendant as reflected in the record of all the proceedings. The knowledge she gained from those contacts required her to balance, on the one hand, her observations of the defendant as articulate, intelligent and aware of the proceedings with, on the other hand, the multiple manifest disagreements the defendant had with his counsel, the disruptions his conduct had brought about in the court's proceedings, and the difficulties

superimposed on Moussaoui's ability to understand the interrelated effects of all the circumstances because his world view essentially clashed with the reality of those circumstances. In the end, and without an evidentiary hearing, the trial judge concluded that none of the factors advanced as a demonstration of Moussaoui's incompetence actually provided a basis to support a finding he was not competent to plead guilty.

Here, there is a clear disagreement between the opinions of the court-appointed and government employed experts over whether Wearing suffered or even continues to suffer a bipolar disorder, and if he does, whether that condition rendered him incompetent on the day of his plea. In assessing the weight to be given the Thomson-Minrath Forensic Evaluation and their later testimony, the undersigned observes that no diagnosis initially was offered to support their conclusions that Wearing was incompetent. Moreover, there initially was some discrepancy between Dr. Thomson and Minrath in their testimony over whether Wearing suffered a Bipolar Type I or Type II disorder. Finally, neither expert, but especially Dr. Thomson, could say which of the diagnostic criteria were met in support of the diagnosis.

Of course, defendant's counsel argued on numerous occasions that, if Wearing could not effectively "assist" his attorney because of his mood disorder, he would meet the first prong of the *Dusky* two-pronged standard. It is clear to the undersigned that, apart from the question of whether Wearing was medicated, this framed much of the inquiry that Thomson and Minrath were asked to perform. Dr. Thomson's initial conclusions were that, although Wearing's condition was not one presenting cognitive disruption, it was "possible" Wearing's mood disorder interfered with his understanding of the legal process. Thomson believed that Wearing's reported mood swings could have caused him to become upset, blame others and be irritable to the point that he did not see he was the problem. This led Thompson to posit what the undersigned has characterized as a "light switch" theory, and he essentially declined to answer

the court's question about whether a court ever could determine, under that theory, when the switch was "on" or "off." In the end, Dr. Thomson was unwilling to say "categorically" that Wearing's bipolar disorder, itself, rendered him incompetent to plead guilty.

As indicated above, the undersigned declines to credit Thomson's suggestion that Wearing would be rendered incompetent whenever he was experiencing an erratic mood episode for several reasons. First, Dr. Thomson's opinions were couched in terms of possibilities. Second, Thomson acknowledged the difficulty with making any attempt to retrospectively determine Wearing's competency. Dr. Thomson inferred, if not conceded, that he did not express a diagnosis that Wearing was suffering a bipolar disorder prior to the hearing. The undersigned recalls that Dr. Thomson testified that his determination that Wearing suffered a bipolar disorder essentially was out of deference to and "in keeping" with what he believed Dowen's records showed. Thomson actually has come to disagree with Dr. Dowen's diagnosis of a Bipolar Type I disorder, instead believing it to be Type II. Third, the undersigned thought it a bit strange that Dr. Thomson declined to opine over Wearing's state immediately preceding and immediately following the plea hearing, including his competency to have stood trial at the time in lieu of pleading guilty. After all, the legal standards are exactly the same. Last, from a policy standpoint, this entire "light switch" theory is unreasonable. Its application would disable a court from taking a plea from a person who was diagnosed with a bipolar affective disorder, because no court could be satisfied, and it would be impossible to determine, whether the switch was "on" or "off" at the very moment a defendant entered the plea.

Dr. Brannen's testimony concerning the adjustment Wearing made to incarceration both before and after the plea, and while serving his sentence also provides a basis for the

undersigned's decision not to fully credit Thomson's opinion.[13]  While she did believe Wearing suffered depression without observed symptoms, he was not on medications for the forty-five days he was at FCI Lexington.  Moreover, Brannen's discussions with Dr. Dowen revealed that he never observed symptoms of mania, and he never performed a competency examination. According to Brannen, Dowen's diagnosis primarily was based on what Wearing self-reported, though he did observe pressured speech.  Brannen was of the view that, if Wearing suffered the effects of a bipolar disorder, symptoms would have been observed by Dr. Dowen and others. While Wearing's interactions with his attorneys were not pleasant, she observed that there had been a great deal of interaction.  Importantly, Brannen noted that Wearing had been examined by Dr. Israel in 2006, a time closer to the plea hearing.  While Israel opined that Wearing suffered a bipolar disorder, he also found Wearing was competent.  She further noted that many criminal defendants "shoot themselves in the foot" by their conduct during the pendency of proceedings, leaving the question of whether such defendants are "stupid-competent" or "stupid-incompetent."

Wearing has failed to persuade the undersigned by a preponderance of the evidence that he was incompetent at the time he pleaded guilty.  There was no signal of it at the plea hearing. Moreover, the record of the post-conviction proceedings shows he actually was able to consult with counsel before and at the time of his plea because, according to his own testimony, he conducted himself in a manner consistent with his counsel's instructions "to not mess up" the plea agreement.  Furthermore, it also would be difficult for anyone to challenge on the entire record before the court the fact that Wearing understood the nature of the charges and the proceedings against him.

---

[13] The undersigned does not challenge the earnest nature of Dr. Thomson's conclusion related to Wearing's competency at the time of his plea.  However earnest, the evidence preponderates otherwise.

Wearing's conduct at sentencing, which was closer in time to his plea than now, was consistent with his expressed disappointment over the sentence imposed. Whether one chooses to believe his testimony, Wearing's post-conviction hearing testimony reveals that he sufficiently understood and was aware enough of the provisions of the plea agreement that, when he did not receive a sentence consistent therewith, he instructed counsel to appeal the sentence.[14]

For the reasons set forth above, the undersigned hereby RECOMMENDS that an Order enter finding that Wearing possessed the mental capacity to enter a knowing and voluntary plea in August 2005.

The Clerk is directed to immediately transmit the record in this case to the presiding United States District Judge. Both sides are reminded that pursuant to Rule 72(b) they are entitled to note objections, if any they may have, to this Report and Recommendation within fourteen (14) days hereof. Any adjudication of fact or conclusion of law rendered herein by the undersigned not specifically objected to within the period prescribed by law may become conclusive upon the parties. Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(l)(C) as to factual recitations or findings as well as to the conclusions reached by the undersigned may be construed by any reviewing court as a waiver of such objection. The Clerk is directed to transmit a certified copy of this Report and Recommendation to all counsel of record.

ENTERED: _____

U.S. Magistrate Judge

Jan 27, 2011

Date

---

[14] Of course, it was the trial court's finding that counsel was ineffective in the follow-up that led to re-entry of judgment and the appeal which led to this point.

23